IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
March 31, 2003 Session

## ALICE KAYE BEASON v. C.A. BEASON

**Consolidated Appeals from the Chancery Courts for Knox County**
**No. 124417-2     Daryl Fansler, Chancellor**
**No. 96068-2     Sharon Bell, Chancellor**
**FILED MAY 2, 2003**

### No. E2002-01425-COA-R3-CV

These appeals involve an equitable distribution of the Tier II railroad retirement benefits of C.A. Beason ("Husband"). When Alice Beason ("Wife") and Husband were divorced the first time in 1989, Wife admittedly made no claim for any of Husband's Tier II benefits and was awarded none. The parties then remarried in 1992 and were divorced for the second time in 1996. A Qualified Domestic Relations Order ("QDRO") eventually was entered in the second divorce which awarded Wife 100% of Husband's Tier II benefits. After Husband became disabled, Wife began receiving all of his Tier II benefits which had accumulated during Husband's 31 years of employment with the railroad. Husband claims he then realized for the first time the true effect of the QDRO and filed a Tenn. R. Civ. P. 60.02(5) motion seeking relief from the judgment. Husband's Rule 60.02(5) motion was granted and the Trial Court entered a new QDRO awarding Wife only 100% of the Tier II benefits which had accrued during the second marriage. Wife then sought relief by Rule 60.02(5) from the judgment entered in the first divorce in 1989, asking that Trial Court to award her an equitable distribution of the Tier II benefits which had accrued during the first marriage. Wife's motion was denied. Wife appeals both decisions. On appeal, we affirm the Trial Court's decision to grant Husband relief from the judgment in the second divorce, and we also affirm the Trial Court's refusal to grant Wife relief from the judgment in the first divorce.

**Tenn. R. App. P. 3 Appeals as of Right; Judgments of the**
**Chancery Courts Affirmed; Cases Remanded**.

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HOUSTON M. GODDARD, P.J., and CHARLES D. SUSANO, JR., J., joined.

J. Mikel Dixon, Knoxville, Tennessee, for the Appellant Alice Kaye Beason.

Brent R. Watson and Suzanne N. Price, Knoxville, Tennessee, for the Appellee C.A. Beason.

# OPINION

## Background

These consolidated appeals concern the division of Husband's Tier II pension benefits under the federal Railroad Retirement Act and applicable Tennessee law. At the outset, a brief description of how the Railroad Retirement Act operates is in order. In *Norton v. Norton*, No. 02A01-9609-CV-00222, 1997 Tenn. App. LEXIS 666 (Tenn. Ct. App. Oct. 1, 1997), *appeal granted and remanded*, this Court stated the following with regard to the defendant/husband's retirement benefits at issue in that case:

> Retirement benefits for railroad employees are governed by federal statute. As a railroad employee the defendant, upon retirement, is entitled to benefits under the Railroad Retirement Act of 1974, (hereinafter the "Act") 45 U.S.C. § 231 *et seq*. The Act's scheme provides for two tiers of benefits which resemble both a private pension program and a social welfare plan. Tier I benefits are equivalent to those the employee would receive if covered by the Social Security Act, 42 U.S.C. § 401 *et seq*. *See* 45 U.S.C. § 231a(a)(1) and § 231b(a)(1). Tier II benefits are supplemental annuities which, like a private pension plan, are tied to earnings and career service. *See* 45 U.S.C. § 231a(b) and § 231b(e).
>
> * * * *
>
> In *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 99 S. Ct. 802, 59 L. Ed. 2d 1 (1979) the United States Supreme Court considered whether an award of railroad retirement benefits to a spouse when dividing marital assets upon divorce was prohibited by the Act. The United States Supreme Court held that 45 U.S.C. § 231m specifically prohibited the division of benefits payable under the Act as property in a divorce. However, in 1983, Congress provided an amendment to § 231m which expressly permits characterization of Tier II benefits as property subject to distribution upon divorce. *See* 45 U.S.C. § 231m(b)(2). Notwithstanding the 1983 amendment, the holding in *Hisquierdo* is still controlling with respect to Tier I benefits.

*Norton*, 1997 Tenn. App. LEXIS 666, at ** 8-10 (quoting *Pearson v. Pearson*, 488 S.E.2d 414, 421-22 (W. Va. 1997)). These appeals involve the equitable distribution only of Husband's Tier II benefits inasmuch as the parties agree the Tier I benefits are not subject to distribution under federal law.

Husband began working for the Railroad on June 10, 1971. Husband and Wife were married approximately three months later. On April 27, 1988, Husband filed a complaint for divorce after more than 16 years of marriage. Wife denied the pertinent allegations contained within the complaint and filed a counterclaim seeking a divorce. The parties eventually agreed to a divorce based upon irreconcilable differences. On November 21, 1989, Chancellor Bell entered a Final Judgment which granted the divorce and approved a Marital Dissolution Agreement ("MDA"). The MDA set forth how the parties were to divide specific marital property and further provided for the custody and care of their minor child. The MDA, however, was completely silent as to any division of Husband's Tier II pension benefits. As to the marital property distribution in the first divorce, Wife admits she "failed to make a claim for a spousal interest in her husband's Railroad Retirement pension benefits." According to Wife, the reason she did not make a claim for any Tier II pension benefits at that time was because of her misunderstanding of how the Railroad's pension plan worked.

On June 22, 1992, the parties remarried. After being remarried for approximately 2½ years, Wife filed for divorce. The parties eventually stipulated Wife was entitled to a divorce based on Husband's inappropriate marital conduct. The case was tried before Chancellor Cate on August 19, 1996, with the only issue being an equitable distribution of the marital property. Chancellor Cate issued his Findings of Fact and Conclusions of Law on August 20, 1996. With respect to Husband's Tier II pension benefits, Chancellor Cate made two findings. First, he awarded Wife "[w]hatever rights the law permits a divorced spouse in regard to [Husband's] railroad retirement/pension." Thereafter, he awarded Husband "[h]is railroad retirement/pension, subject to the rights the law permits [Wife]." A Final Decree of Divorce was entered on September 3, 1996, entered *nunc pro tunc* to August 19, 1996.

After Chancellor Cate entered the Final Decree, the parties continued to disagree over numerous items, including how to transfer property in accordance with the terms of the Final Decree, etc. Eventually, an Agreed Order containing the parties' resolution of many of these issues was entered on July 6, 1999. As pertinent to this appeal, this Agreed Order required the parties to execute a qualified domestic relations order to secure Wife's interest in Husband's Tier II pension benefits.

On June 7, 2000, Wife's attorney submitted a proposed QDRO to Husband's attorney who, in turn, forwarded it to his client. In relevant part, the proposed QDRO provided the following with respect to Husband's Tier II benefits:

> [Wife] is awarded and the Railroad Retirement Board is directed to pay, an interest in the portion of [Husband's] benefits under the Railroad Retirement Act (45 U.S.C. § 231 et seq.) which may be divided as provided be section 14 of that act (45 U.S.C. § 231m). [Wife's] share should be computed as an amount equal to one hundred percent (100%) of [Husband's] monthly benefits.…

A Statement prepared by the Railroad Retirement Board was either attached to the proposed QDRO or sent to Husband's attorney shortly thereafter. In any event, the Statement indicates that if Husband had retired at the end of 1998, his total monthly benefit amount for Tier II benefits would have been $732.24.

Upon receipt of the proposed QDRO, Husband did not believe Wife was entitled to 100% of the monthly benefits, and instructed his attorney not to sign the QDRO.[1] At some point during this process, the matter was set for hearing on August 18, 2000, before Chancellor Fansler, who succeeded Chancellor Cate after he retired from the bench. Husband reminded his attorney that he and Wife had been married twice, and the second marriage was for a relatively short duration. Husband's attorney then sent a letter to Wife's attorney reminding him the parties had been married twice and indicating Husband was attempting to find out the value of the retirement plan for the particular date of the marriage. Wife's counsel responded, stating that according to the General Counsel for the Retirement Board, benefits are determined at the time of retirement. Wife's counsel then added:

> We are not trying to establish a fixed amount with this order. The estimated amount of the retirement benefit was attached to the order for informational purposes only.… Accordingly, advise [Husband] that this was a nice try, but if I do not get your approval on the order within ten days … I plan to send the order to the court with an appropriate request that it be entered.… Of course, I will not do that if you can provide me with some meaningful information that contradicts what I was just told by the attorney for the Railroad Retirement Board.

Because Husband refused to allow his attorney to sign the QDRO, it was sent to the court without a signature indicating his approval. Thereafter, Chancellor Fansler's assistant spoke with Husband's attorney inquiring whether a hearing was needed. Husband's attorney responded that while his client would not allow him to sign the QDRO, he (i.e. Husband's attorney) had no objections to the order. The QDRO then was signed by Chancellor Fansler on July 5, 2000, although the hearing apparently remained on the court's docket. On August 14, 2000, Husband's attorney received a call from Chancellor Fansler's office informing him the hearing had been "bumped." It appears the hearing never took place because the QDRO already had been entered by Chancellor Fansler. After the QDRO was entered, Husband continued to express concern to his attorney over the "100%" language in the QDRO. Husband claims he was told by his attorney that was just the way the Railroad did it and there were no other options - "that was it."

Husband became disabled and started drawing his pension in January of 2001. When this occurred, he started receiving all of his Tier I *and* all of his Tier II benefits. At this point,

---

[1] Although the proposed QDRO did not specifically limit the "100%" of Tier II benefits to the time period in which the parties were married, at one point Husband testified he thought it would be limited in that manner.

Husband believed the QDRO did what his attorney said it would and Wife would not receive any benefits until Husband reached retirement age in approximately seven years. In July of 2001, Husband received a letter from the Retirement Board informing him that a mistake had been made in computing his benefits. Husband then learned the Retirement Board would be sending all of his Tier II benefits to Wife.

Although the parties were divorced for the second time effective August 19, 1996, the record on appeal does not reveal the monthly value of Husband's Tier II benefits at that time, although we know the value was $732.24 per month as of December 31, 1998. By the time Husband became disabled, the total amount of his Tier II benefits was $803 per month. Even though the parties were married for only a little more than four years the second time, the Railroad Retirement Board began sending Wife the entire $803 per month. This sum included 100% of Husband's Tier II pension benefits which accrued during: 1) the entire first marriage (of which Wife admittedly made no claim for these benefits in the first divorce)[2]; 2) the two years and seven months the parties were divorced; 3) the four years and two months the parties were married for the second time; *and* 4) the more than four years in which Husband continued to accrue benefits after the effective date of the second divorce, but before he became disabled.

Husband obtained new counsel who, after gathering pertinent information, filed a Motion to Set Aside or Modify the QDRO entered on July 5, 2000. This motion was filed pursuant to Tenn. R. Civ. P. 60.02(5) on October 26, 2001. A hearing was held on April 23, 2002, at which time Chancellor Fansler inquired of Husband's new attorney why no direct appeal was taken when the QDRO was entered and why it was not clear what the "100%" language in the QDRO meant when it was entered. Chancellor Fansler then stated he wanted to hear proof on these issues, and Husband and his former attorney were called to testify.[3]

After hearing proof as to why Husband was or was not entitled to relief under Rule 60.02(5), Chancellor Fansler granted Husband's motion and set aside the QDRO he had previously entered. In so doing, Chancellor Fansler issued a 16-page Memorandum Opinion which was incorporated into the Order granting the motion. Chancellor Fansler made several conclusions, which we paraphrase:

> 1. The MDA in the first divorce did not award Wife any of the Tier II benefits, and each party was left with whatever rights the pension gave them;

---

[2] Because of how these cases were resolved at the Trial Court level, it never was determined if the 1983 amendment to the Railroad Retirement Act was retroactive, which certainly could impact the amount of Husband's Tier II benefits properly subject to an equitable distribution in the first divorce. While we decline to delve into this issue, we note that Congress expressly provided the amendment "shall apply with respect to annuity payments payable for months beginning after the date of enactment of this Act." *See* Pub. L. No. 98-76, 97 Stat. 411, § 419(b) (1983).

[3] The relevant testimony by the witnesses has been set forth previously in this Opinion.

2.      In August of 1996, when resolving the issues in the second divorce, Chancellor Cate awarded Wife whatever rights the law allowed her with regard to Husband's pension, and Husband was awarded his pension subject to Wife's rights;

3.      Chancellor Cate was dividing marital property and making an equitable distribution of the pension;

4.      Under applicable law, Chancellor Cate could not distribute assets acquired post-divorce;

5.      The property divided in the first divorce, which then became separate property, did not become marital property again simply because they remarried; and

6.      When Chancellor Cate rendered his opinion, Wife's claim to the pension fund would have been limited to the increase in value of the pension during the course of the second marriage.

Chancellor Fansler then reviewed several cases discussing when Rule 60.02(5) relief was available to a litigant. Chancellor Fansler correctly noted it is difficult to obtain relief under Rule 60.02(5), and this Rule cannot be used simply because someone is dissatisfied with the result in a particular case. Husband had the burden to prove he was entitled to relief under Rule 60.02(5). Chancellor Fansler determined that when he entered the QDRO which, in effect, awarded Wife pension benefits she was not entitled to under the law, the QDRO contained an error of law which could form the basis for Rule 60.02(5) relief. Chancellor Fansler also held, however, that if the parties had agreed to entry of the QDRO which contained the error of law, then Husband would not be entitled to relief. After hearing all of the proof and considering the exhibits, Chancellor Fansler concluded there was no agreement by Husband to entry of the QDRO and simply no reason for Husband to relinquish all of his pension with no quid pro quo. After noting his concern over the fact that more than one year had elapsed before the 60.02(5) motion was filed, Chancellor Fansler nevertheless concluded Husband had met his burden and was entitled to relief. After construing Chancellor Cate's initial Findings of Fact as liberally as possible in favor of Wife, Chancellor Fansler set aside the initial QDRO and determined Wife was entitled to 100% of the pension benefits that had accrued during the parties' second marriage, which totaled $191.08 per month. A new QDRO was entered reflecting this judgment.

Wife appeals Chancellor Fansler's judgment to this Court, arguing error was committed in granting Husband relief under Rule 60.02(5). Wife asks this Court to reinstate the terms of the original QDRO entered by Chancellor Fansler.

On May 6, 2002, which was shortly after Chancellor Fansler issued his Memorandum Opinion, Wife filed a Rule 60 motion before Chancellor Bell seeking to set aside or modify the Final

Judgment entered in the first divorce on November 21, 1989. In this Motion, Wife asked Chancellor Bell to modify the Final Judgment and award her an equitable distribution of Husband's Tier II benefits which accumulated during the first marriage. In a nutshell, Wife argued that if Husband was entitled to Rule 60.02(5) relief from the judgment in the second divorce, then Wife was entitled to the same relief from the judgment in the first divorce. Chancellor Bell denied Wife's motion and refused to set aside or modify the 1989 Final Judgment. Wife also appeals this judgment by Chancellor Bell.

Wife's appeals were consolidated. The issues on appeal are whether Chancellor Fansler erred in granting Husband relief from the judgment in the second divorce under Rule 60.02(5), and, if not, whether Chancellor Bell erred in subsequently denying Wife relief from the judgment in the first divorce under the same Rule.

## **Discussion**

A Trial Court's decision to grant or deny relief under Rule 60.02 is reviewed under an abuse of discretion standard. *Federated Ins. Co. v. Lethcoe*, 18 S.W.3d 621, 624 (Tenn. 2000); *Underwood v. Zurich Ins. Co.*, 854 S.W.2d 94, 97 (Tenn. 1993). In *Eldridge v. Eldridge*, 42 S.W.3d 82 (Tenn. 2001), our Supreme Court discussed the abuse of discretion standard, stating:

> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to propriety of the decision made." *State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000); *State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000). A trial court abuses its discretion only when it "applie[s] an incorrect legal standard, or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999). The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998).

*Eldridge*, 42 S.W.3d at 85. Appellate courts ordinarily permit discretionary decisions to stand even though reasonable judicial minds can differ concerning their soundness. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999). A trial court's discretionary decision must take into account applicable law and be consistent with the facts before the court. *Id.* When reviewing a discretionary decision by the trial court, the "appellate courts should begin with the presumption that the decision is correct and should review the evidence in the light most favorable to the decision." *Id.* (citations omitted).

In relevant part, Tenn. R. Civ. P. 60.02 provides:

On motion and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (2) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (3) the judgment is void; (4) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that a judgment should have prospective application; or (5) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1) and (2) not more than one year after the judgment, order or proceeding was entered or taken.…

In the present case, Chancellor Fansler was correct when he stated Rule 60.02 is not for use simply because a party is dissatisfied with a particular result, and also when he concluded Husband had the burden to establish he was entitled to relief. *See Toney v. Mueller Co*, 810 S.W.2d 145, 146 (Tenn. 1991). Despite its broad language, Rule 60.02(5) is construed narrowly. *Federated Insurance Co. v. Lethcoe*, 18 S.W.3d 621, 625 (Tenn. 2000); *NCNB National Bank of North Carolina v. Thrailkill*, 856 S.W.2d 150, 154 (Tenn. Ct. App. 1993); *Steioff v. Steioff*, 833 S.W.2d 94, 97 (Tenn. Ct. App. 1992). The standards of Rule 60.02(5) are even more demanding than those applicable to the other grounds for Rule 60.02 relief. *NCNB National Bank of North Carolina v. Thrailkill*, 856 S.W.2d 150, 154 (Tenn. Ct. App. 1993); *Duncan v. Duncan*, 789 S.W.2d 557, 564 (Tenn. Ct. App. 1990)(citing *Tenn. Dept. of Human Services v. Barbee*, 689 S.W.2d 863, 866 (Tenn. 1985)).

There is no doubt that Chancellor Fansler was troubled with the fact that Husband had worked for the railroad for 31 years and every cent of his Tier II benefits was going to Wife, which included at least some benefits she clearly was not entitled to under applicable law. Chancellor Fansler required the parties to develop proof and present testimony so that he could determine if Husband had met the demanding standards of Rule 60.02(5). Although he did not use the exact wording of the Rule, there is no doubt that he, at least implicitly, found Husband had set forth sufficient reasons justifying relief from the initial QDRO, and that the motion was filed within a reasonable period of time. Chancellor Fansler issued a thorough and reasoned opinion explaining how he reached this result. While reasonable minds may well disagree as to whether the motion was filed within a reasonable time, such a disagreement is the essence of a discretionary decision. We simply cannot conclude Chancellor Fansler applied an incorrect legal standard, reached a decision which was against logic or reasoning, or that he caused an injustice to either party. Accordingly, we hold Chancellor Fansler did not abuse his discretion when he granted Husband relief pursuant to Rule 60.02(5).

Having found Chancellor Fansler committed no reversible error, we now must determine if Chancellor Bell abused her discretion when she refused to grant Wife relief under Rule

60.02(5). Wife's motion was filed 12 ½ years after entry of the Final Judgment in 1989. Although Chancellor Bell did not explain the reason(s) for her denial of Wife's motion, we nevertheless conclude she did not apply an incorrect legal standard, reach a decision against logic or reasoning, or cause an injustice to Wife by refusing to reopen a divorce proceeding which had been concluded for 12 ½ years. Even under the frustrating factual and procedural situation of this case, we hold that the motion was not made within a reasonable time when it was filed over twelve years after the entry of the final judgment. Accordingly, we hold Chancellor Bell did not abuse her discretion when she refused to grant Wife relief pursuant to Rule 60.02(5).

### Conclusion

The judgments of both Trial Courts are affirmed, and each cause is remanded to the respective Trial Court for further proceedings as necessary, if any, consistent with this Opinion, and for collection of the costs below. Costs on appeal are assessed against the Appellant Alice Kaye Beason and her surety.

_____
D. MICHAEL SWINEY, JUDGE