IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 5, 2010 Session

## ANTHONY MURRAY v. CHARLOTTE MURRAY

**Appeal from the Chancery Court for Wilson County**
**No. 03243      Charles K. Smith, Chancellor**

_____

**No. M2009-01576-COA-R3-CV - Filed September 28, 2010**

_____

The trial court transferred primary residential placement of an eight year old girl from her mother to her father, finding that the mother's post-divorce conduct, including evidence of drug use and sexual indiscretions, amounted to a material change of circumstances, and that it was in the child's best interest for the father to become her primary residential parent. Because the evidence does not preponderate against the trial court's findings, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

John D. Kitch, Nashville, Tennessee; Charlene Robin Vance Kent, Watertown, Tennessee, for the appellant, Charlotte Murray.

Andrea Hagan, Susan M. Merry, Lebanon, Tennessee, for the appellee, Anthony Murray.

**OPINION**

**I.  Divorce and Custody**

Anthony Shawn Murray ("Father") and Charlotte Wright-Murray ("Mother") married and became the parents of one child, a daughter named Presleigh, born on July 28, 2000. Mother had another child from an earlier relationship, a boy named Clay, born on June 4, 1996. Mother filed a complaint for absolute divorce in the Chancery Court of Wilson County, and Father filed a counterclaim. The parties subsequently entered into a written Marital Dissolution Agreement (MDA) for an equitable settlement of all property rights between the parties and establishing a parenting arrangement for their child.

A parenting plan attached to the MDA set out the parties' agreement for residential parenting time and child support. Under the plan, Mother was named as Presleigh's primary residential parent, with Father to exercise visitation with her every other weekend from Friday, 6:00 p.m. to Sunday, 6:00 p.m. The parties were to be jointly responsible for making major decisions regarding the child. Father, a salesman, was obligated to pay child support in accordance with the Tennessee Child Support Guidelines, in the amount of $115.50 every two weeks, "plus 21% of all additional commissions and compensation." He also agreed to secure his child support obligation by obtaining a life insurance policy in the amount of $100,000, with the minor child named as the primary beneficiary.

One relevant provision in the Parenting Plan reads as follows:

The parties shall abstain from the over-consumption of alcohol while the minor child is in his/her possession. Additionally, the parties shall not take any illegal substance or be under the influence of the same while the minor child is in his/her possession. Further, both parties agree that, when the minor child is present, to not have any person with whom he/she is romantically involved, absent marriage, overnight.

On July 14, 2004, the trial court entered a Final Decree of Divorce, freeing the parties from the bonds of matrimony on the ground of irreconcilable differences. The MDA and the Parenting Plan were incorporated into the decree. On August 23, 2004, the trial court approved an Amended Parenting Plan which gave Father additional overnight visitation from Tuesday night until Wednesday, on those weeks when he did not have weekend visitation.

## II. POST DIVORCE PROCEEDINGS

On August 15, 2007, Father filed a Petition for a Permanent Change of Custody as well as an "Ex Parte Petition for Emergency Custody and Restraining Order Granting Father Exclusive Emergency Custody Pending a Hearing." Both petitions stated that Mother's home had been raided by law enforcement authorities two days earlier; that Wilson County Deputies had found marijuana, dilaudid, and morphine in the home; and that criminal charges against Mother were likely to be forthcoming.[1] Father further alleged that Mother had taken out an order of protection against her paramour, with whom she had shared her home, that Mother would leave the parties' child unsupervised while she drank alcohol and abused illegal drugs; and that Mother had a new paramour, who also abused illegal drugs.

---

[1] In February of 2008, the Wilson County Grand Jury did in fact indict Mother for possession of a controlled substance and possession of drug paraphernalia. Mother was later given pre-trial diversion, and her record was eventually expunged.

On August 16, 2007, the trial court granted Father an Emergency Order of Exclusive Custody, with Mother to exercise only supervised visitation pending a further hearing by the Court. That hearing took place on September 24, 2007, and it resulted in an order in which the court stated that "Mother has exercised bad judgment in her choice of roommates,"but that nonetheless Father had "failed to carry his burden of proof to support an immediate, emergency change of custody."

The court stated that both parties had volunteered to submit to hair follicle drug testing, and it declared that if Mother received a clear hair follicle test, the child would be immediately returned to her, pending a final hearing. The court also warned that "[t]he Mother's living with different men will not be tolerated." Mother's test proved to be negative for drugs, so the child was returned to her shortly thereafter, and the parties resumed their previous residential parenting arrangement.

It appears that in August of 2008, Father filed an Emergency Motion to suspend visitation.[2] The court conducted a hearing on the motion on Sept 3, 2008. In the order arising from that hearing, entered on September 23, 2008, the trial court declared that it "is concerned for the welfare of the parties' minor child." The court accordingly authorized and ordered a criminal history of Mother's boyfriend to be conducted at Father's expense. It also increased Father's visitation from Sunday at 6:00 until Tuesday at school.

### III. THE FINAL HEARING

The final hearing on Father's custody petition[3] took place over two days, on May 18 and May 22, 2009. The parties' child was the first of twelve witnesses to be called to the stand. She testified before the court, but outside the presence of the parties and of other witnesses. We will discuss her testimony later in this opinion.

---

[2]The Emergency Motion to Suspend Visitation is not found in the record on appeal. However, the trial court refers to the motion in its order of September 23, 2008, and Mother's attorney mentions it during opening argument in the final hearing in this case.

[3]On May 18, 2009, Mother filed a petition for contempt, claiming that Father had failed to pay the full amount of his child support obligation. She alleged that he had only made one payment since 2004 on his obligation to pay support beyond $115.50 every two weeks, based on 21% of all his additional commissions and compensation. Mother claimed that he had prevented her from ascertaining the full amount of his obligation by failing to provide her with a copy of his pay stubs or earnings statements. She also claimed that Father had failed to obtain or to provide proof that he had obtained life insurance for the child's benefit. Mother's petition for contempt was filed on the first day of trial. Thus, there was insufficient time for Father to respond to the petition, and Mother's contempt claim was not adjudicated by the trial court during the custody hearing.

The proof showed that Mother had lived for five months with a man named Billy Wells, whose son was in the same school as the parties' child. After Mother and Mr. Wells broke up, Mr. Wells called Father and told him that Mother was using marijuana, morphine and other drugs at her residence. Father then contacted the Wilson County Sheriff's Department.

After speaking to both Father and Mr. Wells, Detective Lieutenant John Edwards of the Narcotics Division obtained a search warrant for Mother's house. A search of the house was conducted pursuant to the warrant on August 13, 2007. It resulted in the discovery and seizure of small quantities of drugs and drug-related materials, including three nearly-empty morphine vials.[4] Mother, a nurse, was later discharged from her position at Vanderbilt University Medical Center in connection with the theft of the vials of morphine. At the time of trial, she was working at Hendersonville Hospital.

Mother was questioned closely about her relationships with different men. She admitted that some of her choices were not good and that she had taken out an order of protection against Billy Wells. She testified to a sexual relationship in 2006 with a married man who was also a nurse at Vanderbilt, but she stated that he was separated from his wife at the time. She admitted, however, that his wife came to her parents' house while a lot of people were there and confronted her about the relationship. Mother stated that "I was never involved with him around my children. I'm not going to sit here and say it was not a mistake, but I've learned from my mistakes."

Mother also reluctantly admitted to inappropriate sexual activity with another married man, who was her son's basketball coach. She stated that, "I'm not saying that I've made the best decisions in men. But I know who I am as a mother and I've never done anything inappropriate with my children around." Another relationship with troubling aspects involved a Knoxville man named Heath, whom she met on the internet through a website called Love and Seek. Mother testified that she went to Knoxville to meet Heath, and that she brought Presleigh with her. They stayed overnight at Heath's apartment. Mother claimed that nothing inappropriate occurred and that she slept on the living room couch while her daughter slept on the living room floor. Heath later visited Mother at her house with his two daughters, and they spent the night there.

---

[4]The testimony of Detective Edwards showed that detectives found and seized a small amount of marijuana; three glass morphine vials with a small amount of liquid in the bottom of each vial; an elastic arm band; a glass pipe, a baggy with white pills which proved to be phentermine, a schedule IV controlled substance which is used for weight loss; and a bottle of Lorazepam. Detective Edwards testified that the liquid in the morphine vials could not be tested. Daniel Voss, a former boyfriend of Mother's was at the house at the time of the search. Detectives found two bags of marijuana in his vehicle, which he admitted were his.

Mother was questioned about some photographs she had taken of herself with her cell phone, posing naked in front of a mirror. She sent those pictures to her then boyfriend, and as sometimes happens, the pictures were given a wider circulation than Mother intended. She was surprised to see those photos, together with other photos of a sexually explicit nature, in a file on her boyfriend's computer, and a friend of hers e-mailed those photos to Mother's computer over the internet. At one point, Presleigh saw one of the nude pictures on Mother's cell phone. Mother testified that after that happened, she deleted the photos from her phone.

The child's kindergarten and first grade teachers at Friendship Christian Academy both testified that Presleigh was a good student, that she was very popular with her peers, and that she consistently made good grades. They also testified that their interactions with Mother and Father showed that both parents were actively involved in their daughter's education. Their participation included attending open houses and coming to school on a regular basis to have lunch with Presleigh.

The first grade teacher testified that the child was almost always on time, was "very well dressed, hair perfect, clothes, just very well-dressed, just a very good student." She was also described as always "very perky and smiling," and as very smart, very well-adjusted, honest and trustworthy. But on August 14, 2007, which was the day after the search of Mother's house, her first grade teacher testified that Mother brought Presleigh in late, and according to her teacher, the child appeared to be very confused, was somewhat disheveled, and she had a very dazed look in her eyes that the teacher had never seen before.

Mother transferred Presleigh to a public school, Carroll-Oakland Elementary School in Lebanon, for second grade. Her half-brother was already a student in the middle school section of Carroll-Oakland. The guidance counselor and the Assistant Principal at Carroll-Oakland were questioned about their observations of Presleigh, and also about her brother. They testified that the brother frequently got into trouble and that he was disciplined for disrespect, aggressive behavior, and fighting. He was suspended from school many times and was in the middle of a seven day suspension at the time of trial. Mother also testified that her son was suicidal and that at one point she took him to Rivendale, a behavioral psychiatric hospital for children, where he stayed for several weeks. Mother asserted that she loved both her children, that she was working with Clay, and that he was making progress in dealing with his problems.

Father testified that he had remarried and that his new wife has two teenage daughters. He declared that if he was granted custody of Presleigh, he was willing and able to take care of her, and he promised that Mother would continue to have access to the child. He claimed that he had always paid the full amount of his legally required child support, but admitted

that he no longer maintained a life insurance policy for the child's benefit. His testimony was that he lost the life insurance in 2008, at the same time that he lost his job with Clayton Homes.

Father stated that he was unemployed for about five months, but now works forty hours a week in a warehouse job and that he is also a partner with another man in a new insurance agency. He stated that he wanted the court to grant him sole decision-making power over the child because he does not think Mother makes good decisions, but that he is willing to discuss all issues of child-rearing with her and to share all relevant information.

Although she was not quite nine years old at the time of trial, it appears from the transcript that Presleigh was able to answer every question put to her without hesitation and in a forthright and articulate manner. She acknowledged having seen a naked picture of Mother on Mother's cell phone, and she stated that she knew that Mother was doing drugs. She also said that she had found a skinny cigarette in Mother's purse and some blue pills.

The child was also familiar with the men Mother had testified about. She said she remembered Billy Wells coming over and spending the night, and that sometimes they would go over to Billy's ex-wife's house. Speaking of Mother's current boyfriend, she said "he's come to our house and spent the night and stuff like that." She was asked about how many times she had spent the night at the home of Heath, the man Mother had met on the internet. She answered "at least two, probably more, but at least two." She also said that staying at Heath's house scared her.

The child was asked about the household situation of both her parents. Among other things, she said that she usually did not have breakfast at Mother's house, but that Father or Father's wife would always prepare breakfast for her. Both parents helped her with her multiplication tables, but Father gave her more help. The child acknowledged that she loved both of her parents, but when she was asked which parent she would prefer living with, she said, "I want to live with my dad more." Her reason was "He's nicer and I like him better." She also said that she does not get along with her brother, because he plays rough with her, he hits, and he "is really mean and he says bad words too."

At the conclusion of proof, the trial court announced its decision from the bench. The court stated that the proof showed that there had been a substantial and material change of circumstances that affected the welfare of the child. The court specifically cited Mother's sexual relationships with married men, other relationships which the court deemed to carry risks for the child, and the overwhelming evidence that Mother had abused several different kinds of drugs. The court stated, "I have a real problem with her morals, with the people she hangs around with. I don't want this to be taught to a child. I also – I think she's been a

good mom at school and works and has got a home."

The court cited Father's testimony that he was happily married and that his wife's two girls got along well with Presleigh. The court also stated that Mother's son had developed some real psychological problems, and that Mother's lifestyle may have contributed to his problems. While acknowledging that Presleigh was a smart girl, the court stated that going from one household to another can require difficult adjustments, and that even though she is stable now "that does not mean she cannot become a psychological basket case."

The court said that after considering all the evidence, "I'm of the opinion that it would be in the child's best interest to live with the father." The court accordingly transferred primary residential placement of Presleigh to Father, with Mother to exercise visitation every other weekend. The court's determination was memorialized in a Final Order, which was entered on July 2, 2009. The order eliminated Father's child support obligation and awarded him child support of $125 every week. The new parenting plan provided that major decisions regarding the child would remain joint between Father and Mother. The parties were made responsible for their own attorney fees. This appeal followed.

## IV. ANALYSIS

### A. The Standard of Review

Since this is a non-jury case, our review on appeal of the trial court's findings of fact is *de novo* with a presumption of correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Blair v. Brownson*, 197 S.W.3d 681, 684 (Tenn. 2006); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). We review a trial court's conclusions of law *de novo*, with no presumption of correctness. *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn. 1993).

Matters of child custody and visitation are generally held to be within the broad discretion of the trial court. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). Because of the fact-specific nature of such decisions, and because the trial court has been able to directly assess the credibility of the witnesses, appellate courts are reluctant to second guess a trial court's determination regarding custody and visitation. *Nelson v. Nelson*, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001); *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997).

We therefore must affirm the determination of the trial court unless we find that it has abused its discretion. A trial court abuses its discretion if it makes material errors of law, if its decision is contrary to the preponderance of the evidence, or if it reaches a decision which

is against logic or reasoning that causes an injustice to the party complaining.  *Eldridge v. Eldridge,* 42 S.W.3d at 85; *Beason v. Beason,* 120 S.W.3d 833, 839 (Tenn. Ct. App. 2003). The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.  *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998).

## B.  A Material Change of Circumstances

A decision on a request for modification of a parenting arrangement requires a two-step analysis.  *Cranston v. Combs*, 106 S.W.3d 641, 644 (Tenn. 2003).  A party petitioning to change an existing custody order must prove both (1) that a material change of circumstances has occurred and (2) that a change of custody or residential schedule is in the child's best interest.  *Kendrick v. Shoemake*, 90 S.W.3d 566, 575 (Tenn. 2002).  The occurrence of a material change of circumstances and the best interest of a child are both questions of fact.  *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007).  We must therefore presume that the trial court's findings as to these two elements are correct, unless the evidence preponderates otherwise.  Tenn. R. App. P. 13(d).

As to the first requirement, *i.e.*, a material change of circumstances, the Tennessee Supreme Court has stated:

> Although there are no bright line rules as to whether a material change in circumstances has occurred after the initial custody determination, there are several relevant considerations: (1) whether a change has occurred after the entry of the order sought to be modified; (2) whether a change was not known or reasonably anticipated when the order was entered; and (3) whether a change is one that affects the child's well-being in a meaningful way.

*Cranston v. Combs*, 106 S.W.3d at 644 (citing *Kendrick v. Shoemake*, 90 S.W.3d at 570)).

The material changes cited by the trial court were Mother's sexual adventures, her drug use, and the problems experienced by her son Clay.  While Mother tried to minimize the magnitude of those changes, she admits that she exercised bad judgment, and she does not dispute that the events testified to occurred after the entry of the parenting plan Father sought to modify.  Further, in light of the provision in the parenting plan prohibiting the parties from taking illegal drugs or allowing overnight visits by any person with whom he or she was romantically involved, Mother can not claim that it was known or reasonably anticipated that she would indulge in such conduct.[5]

_____

[5]Mother testified that overnight visits with her boyfriends did not occur when Presleigh was present,
(continued...)

Mother argues, instead, that the trial court committed a material error of law by focusing on her own behavior, which she admits was inappropriate, rather than on whether that behavior affected Presleigh's well-being. Mother cites the child's exemplary record in school and the testimony of her teachers that she was well-behaved and well-adjusted and an outstanding student. Mother asserts that there was no evidence whatsoever that her behavior had any negative effect on the child.

But Presleigh's first grade teacher testified that the day after the drug search of her home, Mother brought the child in late, and that she appeared to be confused and to have a dazed look in her eyes. Further, Presleigh testified that she was scared when Mother took her to Knoxville and she had to spent the night in the house of a man Mother met on the internet. Mother also admitted to an angry confrontation initiated by the wife of a man with whom she had an affair, and the record shows that she felt it necessary to take out a restraining order against a man she had previously lived with. All this evidence suggests that Mother cannot insulate her child from the effects of the poor choices she makes. The fact that the conduct Presleigh has been exposed to has not yet resulted in observable serious problems for her is not a reason for this court to ignore that conduct or the child's testimony regarding its effect.[6]

Mother raises a related argument, however, by contending that the trial court erred by focusing on what might happen to the child in the future, rather than on what had actually happened. She cites the trial court's reference to the possibility that the child could become "a psychological basket case" as mere speculation, which, she argues, is insufficient to support a finding of a material change of circumstance. Mother relies on this court's opinion in the case of *Berry v. Berry,* E2004-01832-COA-R3-CV, 2005 WL 1277847 (Tenn. Ct. App. May 31, 2005) (no Tenn. R. App. P. 11 application filed), in which we reversed the trial court's transfer of custody from the mother to the father because, "the trial court based its decision in part on the future effect the mother's sexual conduct *may* have on the child" (emphasis in original).

The *Berry* case involved a mother who began dating individuals of the same gender after her divorce and a father whose petition for change of custody alleged that the mother's homosexuality and her cohabitation with several different partners amounted to a material

---

[5](...continued)
thus in effect denying that she had violated the parenting plan's prohibition against having any person with whom she is romantically involved stay overnight when the minor child is present. The child's testimony contradicted Mother's assertion.

[6]We note that a party asserting a material change of circumstances is not required to prove a substantial risk of harm to the child. Tenn. Code Ann. § 36-6-101(a)(2)(B) and (C) (Supp. 2009).

change of circumstances. The trial court found that the child was well-adjusted and had not been affected by his mother's sexual orientation, but it nonetheless declared that the mother's "gay lifestyle" would have an adverse effect on the child in the future. On appeal, this court noted that the father had not presented any evidence to indicate that the mother's homosexuality would cause the child problems as he matured, and we declared that this was not a matter about which the court could take judicial notice.[7]

Unlike in the present case, there was no evidence in the *Berry* case of the use of illegal drugs on the part of the mother, no evidence that any of her partners was in a marital relationship with someone else, no evidence that nude photos of her had been sent out over the internet, and no mention of any discord between the mother and her former partners. There was also apparently no evidence in the *Berry* case of any kind of adverse effect on the child arising from the mother's lifestyle, or if there was, the trial court obviously did not find it credible.

In the present case, there was at least some evidence that Mother's dalliance with drugs and with some of her sexual partners did have an adverse effect on the child. It may therefore be a close call, but we believe that the evidence does not preponderate against the trial court's conclusion that there was a material change of circumstance that affected the child in a meaningful way, or made the existing parenting plan no longer in the best interest of the child. *See* Tenn. Code Ann. § 36-1-101(a)(2)(B).

## C. The Best Interest of the Child

Only after a threshold finding that a material change of circumstances has occurred is the court permitted to go on to make a fresh determination of the best interest of the child. *Kendrick v. Shoemake*, 90 S.W.3d at 569; *Blair v. Badenhope*, 77 S.W.3d 137, 150 (Tenn. 2002); *Curtis v. Hill*, 215 S.W.3d 836, 840 (Tenn. Ct. App. 2006). Our legislature has set out a list of factors in Tenn. Code Ann. § 36-6-106(a) for the trial court to apply to determine where the best interest of the child lies.

Mother complains that the trial court failed to apply the statutory factors, and she argues that a proper application of those factors based upon the proof in the record shows that it would be in the best interest of the child to remain with Mother. Although the trial

---

[7]We did observe, however, that "[a] parent's sexual conduct, be it heterosexual or homosexual, if practiced inappropriately or indiscriminately, can adversely affect a child's well-being and in those cases , a parent's sexual conduct can be a determinative factor in custody determinations. *Berry v. Berry*, 2005 WL 1277847 at *5.

court did state that it would be in the best interest of the child to live with Father, it did not set out its reasoning in terms of the statutory factors.

This court strongly encourages trial courts to be as specific as possible when making findings regarding child custody. *Burnett v. Burnett*, No. E2002-01614-COA-R3-CV, 2003 WL 21782290 (Tenn. Ct. App. July 23, 2003) (no Tenn. R. App. P. 11 application filed). Nonetheless, while the statute requires the trial court to consider all the applicable factors, there is no statutory requirement that the court list every applicable factor along with its conclusion as to how that particular factor impacted the overall custody determination. *Minton v. Fox*, No. E2005-02740-COA-R3-CV, 2006 WL 3017885 at *5 (Tenn. Ct. App. Oct. 24, 2006) (no Tenn. R. App. P. 11 application filed) (citing *Burnett v. Burnett*, 2003 WL 21782290 at *6).

We must therefore perform our own analysis. Having reviewed the factors set out in Tenn. Code Ann. § 36-6-106(a), we find the following evidence relevant.

The proof shows that both parents love the child and that she has strong emotional ties to both. The parents are equally disposed to provide the child with whatever is needed for her care and development. Mother has been the primary caregiver, but Father has exercised more than standard visitation, and there is proof that he is somewhat more attentive to the child's needs in some ways, such as making sure she has a good breakfast before going to school. Mother claims that this factor weighs in her favor, because Father has failed to pay all his required child support. But Father claimed that he met all his child support obligations, and no proof was taken on the question because Mother did not raise her allegations of non-payment until the date of trial.

Mother has been the child's primary residential parent ever since the divorce, with the exception of the five weeks after the drug search of Mother's house, when Father exercised emergency custody. We note, however, that Father has consistently functioned as the alternate residential parent both on weekends and during the school week, so a change of custody to Father would not represent a radical break in continuity.

Father testified that he is happily married, and no evidence was presented of any instability in his relationship with his wife or his two stepdaughters. Mother has had romantic or sexual relationships with at least seven different men since the divorce. She has had to take out a restraining order against at least one of them.

The child has excelled at school, is well-adjusted, and has no record of disciplinary issues. Mother insists that this factor favors her, since the child has thrived while primarily in her care. However, the testimony of Presleigh's teachers shows that both parents are

equally involved in her education, that Father comes to school to have lunch with his daughter on a regular basis, and the child testified that Father helps her with her multiplication tables more than Mother does.

Presleigh unequivocally declared that she would prefer to live with Father. There was no evidence that any sort of improper influence was brought to bear on her prior to that declaration. Since the child was not quite nine years old at the time of trial, lesser weight may be given to her preference. We note, however, that this bright child explained her preference and described the conditions at each parent's home.

The trial court expressed concern about some of Mother's male friends, While there is no proof that any of them has had a negative impact on the child, Mother's lack of judgment in establishing some of these relationships could pose a danger to the child. Also, Presleigh's older brother Clay has a history of disciplinary problems and he has attempted suicide. Presleigh testified that he hits her, that he is mean, and that he uses bad words. There was no evidence that she had any similar problems with Father's stepdaughters.

Both parents are to be commended for their willingness to work with each other for the benefit of the child.

When we consider all these relevant factors and the evidence presented, we find that both parties are capable of taking good care of the child, but that insofar as the child's best interest lies in being placed in the care of one parent rather than the other, that interest is served by her residing primarily with Father. We therefore conclude that the trial court did not abuse its discretion when it designated Father as the child's primary residential parent, and we accordingly affirm the decision of the trial court.

### D. Attorney Fees

Father asks this court to award him his attorney fees on appeal. He notes that our legislature has authorized the courts to award reasonable attorney fees to the prevailing party in alimony, child support or custody cases, Tenn. Code Ann. § 36-5-103(c), and that the statute applies to appellate courts as well as trial courts. *Pippin v. Pippin*, 277 S.W.3d 398, 407 (Tenn. Ct. App. 2008).

Father also cites Tenn. Code Ann. § 27-1-122 as an independent basis for an award of attorney fees. That statute allows any reviewing court to award "just damages" for frivolous appeals or those taken solely for delay, because "[s]uccessful parties should not have to bear the cost and vexation of baseless appeals." *Jackson v. Aldridge*, 6 S.W.3d 501, 504 (Tenn. Ct. App. 1999) (citing *Davis v. Gulf Insurance Group*, 546 S.W.2d 583, 586

(Tenn. 1977)). "An appeal with no reasonable chance of success is frivolous." *Jackson,* 6 S.W.3d at 504. It does not appear to us that the present appeal is frivolous or that it was taken solely for purposes of delay.

Further, Tenn. Code Ann. § 36-5-103(c) specifically states that awards of attorney fees under that statute are made "in the discretion of such court." After considering the entire record in this case, we see no compelling reason to exercise our discretion by awarding Father his attorney fees on appeal

## V.

The judgment of the trial court is affirmed. We remand this case to the Chancery Court of Wilson County for any further proceedings necessary. Tax the costs on appeal to the appellant, Charlotte Wright-Murray.

_____
PATRICIA J. COTTRELL, JUDGE